UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| IKE WILLIAMSON, AFEWERKI ABEBE, ARTHUR SCOTT, MAURICE SHELTON, TERRY HOLLENBACK, BEN GORSUCH, DAVID THIESSEN, CLARK BONCQUET, DOUGLAS FOUNTAIN, TIMOTHY KUHNS, CHRIS MIHU, WARREN HULTMAN, TROY GROVER, CURTIS KANE, MALCOLM BELFROM, JR., VINCENT COVINGTON, DEWAYNE HALL, MARK KLINGMAN, RICKY BLAIR and ODEY AGI, | ) ) ) ) ) ) ) ) ) ) ) ) ) | 1:03-cv-1456-SEB-TAB |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| UNITED AIRLINES, INC.; INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS; and INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, DISTRICT LODGE 141-M, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**ENTRY ADDRESSING MOTIONS FOR SUMMARY JUDGMENT**

This cause comes before the Court on the Motion for Summary Judgment [Docket No. 114] filed on April 13, 2007, by Defendants International Association of Machinists and Aerospace Workers ("IAMAW") and International Association of Machinists and Aerospace Workers-District Lodge 141-M (collectively "IAM"), pursuant to Federal Rule of Civil Procedure 56, as well as the Motion for Summary Judgment [Docket No. 118]

filed on April 13, 2007, by  Defendant United Airlines, Inc. ("United"or "the Company"),

and the Cross-Motion for Summary Judgment or Alternatively Partial Summary Judgment

[Docket No. 165] filed on February 15, 2008, by Plaintiffs, former United mechanics,

also filed pursuant to Rule 56.  In its Motion for Summary Judgment, IAM asserts that it

is entitled to judgment as a matter of law because arbitration and previous agreements

between the parties foreclose any claims regarding violations of the collective bargaining

agreement.[1]  In its Motion for Summary Judgment, United asserts that it is entitled to

judgment as a matter of law because the onset of the Iraq War in 2003 constituted an

unforeseeable business circumstance that relieves it of liability to Plaintiffs and that any

claims related to violations of the collective bargaining agreement are foreclosed.

Plaintiffs assert in their Cross-Motion for Summary Judgment that they are entitled to

judgment as a matter of law because United's layoff procedures violated the Worker

Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. §2101-2109.  For the

reasons detailed in this entry, we <u>DENY</u> Plaintiffs' Motion, <u>GRANT</u> IAM's Motion, and

<u>DENY IN PART</u> and <u>GRANT IN PART</u> United's Motion.

---

[1]This Motion, as it pertains to a document referred to as Letter 94-5M, is now effectively maintained against only one plaintiff, Afewerki Abebe.  <u>See</u> Def. IAM's Reply [Docket No. 185]. A recent Joint Stipulation of Dismissal [Docket No. 164] was issued against all other Plaintiffs on the Letter 94-5M issue, discussed below.  We therefore address it only with regard to Abebe.

### *Background Facts*

Plaintiffs are mechanics who formerly worked at United Airlines's Indianapolis Maintenance Center ("the IMC"). In 2003, after being laid off, they filed suit against their former employer, United, and their former union, IAM (consisting of IAMAW and District Lodge 141-M). United and IAMAW were for many years parties to various agreements entered into pursuant to the Railway Labor Act, 45 U.S.C. §151, fixing the system-wide hours, rates of pay, rules, and working conditions of United's mechanics. District Lodge 141-M is a subunit of IAMAW previously authorized to negotiate and administer the United-IAM agreements and the collective bargaining relationship between United and the IMC mechanics. In July 2003, IAM was replaced by the Aircraft Mechanics Fraternal Association ("AMFA"), which was certified as the new collective bargaining unit for the IMC mechanics as a result of conflicts between Plaintiffs and IAM related to the claims in this case. Kain Decl. ¶5.

In the years preceding this lengthy litigation, United underwent various economic difficulties, leading in December 2002 to United's decision to file for Chapter 11 Bankruptcy protection. Kain Decl. ¶9. The Company thereafter began the process of negotiating labor-cost reductions with each of its unions, including IAM, a process governed by the Bankruptcy Code. See 29 U.S.C.§1113. Because of the slowdown at United, by 2003, the IMC was operating at roughly 50% capacity. Pl.'s Br. in Opp. To Def.'s Motion for Summ. Judgment at 4.

In the foreground of these troubles as they relate to the case at bar, on March 19,

2003, the U.S. Government announced the commencement of a shooting war in Iraq (the "Iraq War" or "War").  Almost immediately thereafter, United initiated drastic employee reductions throughout the Company, including the placement of hundreds of United mechanics on "Authorized No Pay" status,[2] pursuant to the collective bargaining agreement ("CBA").[3]  Entry of September 24, 2004 [Docket No. 88] at 10.  The IMC mechanics, including Plaintiffs, were notified on or about March 21, 2003, that they would be placed on Authorized No Pay status (effective for some on March 24 and for the rest on April 15), and at that time United gave notice to IAM of this action. Id.

In response, IAM sued United for violations of the CBA.  IAM and United settled that lawsuit, agreeing upon what they considered to be a less harmful course to themselves and the affected employees.  The technicalities encompassed in that settlement agreement, which are not relevant to the present cause, were discussed at length in a previous entry issued by Judge Tinder.  Id. at 6-17.[4]

---

[2]Authorized No Pay status refers to a temporary employment standing, during which the Company makes a final decision about future employment.

[3]On March 14, 2002, United and IAM executed a collective bargaining agreement which set terms and conditions of employment for the mechanics and related craft employees through July 11, 2005.  On December 9, 2002, United filed for Chapter 11 bankruptcy protection. Promptly thereafter, United began the process of trying to negotiate labor-cost reductions with each of its unions, a process governed by Section 1113 of the Bankruptcy Code. 29 U.S.C. §1113.  Pursuant to that process, on April 10, 2003, United and IAM concluded a Restructuring Agreement Amendment with an effective date of May 1, 2003.  This agreement modified the CBA and extended its amendable date to May 1, 2009.  Entry of September 24, 2004 at 5.

[4]Previous entries related to this case were issued by then District Court Judge Tinder. The case has since been transferred to the docket of the judge indicated below.

The contours of Plaintiffs' suit against United and IAM in the present cause have been shaped over time by entries from this Court as well as side agreements by and between the parties. A brief review of previous dispositions helps to clarify the dispute in its current form. Plaintiffs originally challenged United's interpretations of the CBA and other documents, claiming that United violated the CBA by not honoring their rights as senior employees of the Company. Specifically, they claimed that United failed to give them an effective opportunity to "bump" junior employees at other locations, or replace them, upon being laid off. Entry of September 24, 2004 at 1-4.

In conjunction with this claim against United, Plaintiffs alleged that IAM breached its duty of fair representation to them, specifically claiming that IAM's deficient representation allowed United to violate the CBA in the manner in which it laid them off.[5] Plaintiffs' original claim also alleged a violation of the WARN Act.

In September 2004, Judge Tinder addressed Motions to Dismiss by United and IAM. In response to that cause, he ordered the proceedings stayed until certain issues of interpretation of the CBA were resolved. There, he concluded that the duty of fair representation inquiry and the CBA interpretation issues were not matters for the Court to interpret, but rather that final disposal of Plaintiffs' grievances, other than the WARN Act

---

[5]"The [Railway Labor Act] affords an employee an implied right of action against his union for breach of the duty of fair representation." Steffens v. Bhd of Ry. Clerks, 797 F.2d 442, 222-45 (7th Cir. 1986). A union breaches this duty "only if its actions are arbitrary, discriminatory, or in bad faith." Neal v. Newspaper Holdings, Inc., 349 F.3d 363, 369 (7th Cir. 2003). Moreover, an "employer is liable together with the union for the union's breach of its DFR if it acts in collusion with the union." United Indep. Flight Officers v. United Air Lines, Inc., 756 F.2d 1274, 1283 (7th Cir. 1985).

claim, was appropriate for arbitration.[6]

Pursuant to that order, the parties hired a well-known arbitrator, who, along with a representative of United and a representative of AMFA,[7] assessed the question of whether United violated the CBA in the manner by which it executed the 2003 layoffs.  By a vote of two to one (with the AMFA member in dissent), the arbitration board concluded that United  properly implemented the layoffs under the CBA.  Def. IAM's Br. in Supp. at 13.[8]  After the arbitration award was issued, Plaintiffs asked AMFA to challenge the layoffs further as violating an old agreement referred to as Letter 94-5M,[9] but AMFA declined to pursue that course.  By agreement, United and AMFA resolved the remaining issues surrounding Plaintiffs grievances, including the duty of fair representation issue.

Because so many of the issues underlying this litigation were resolved by events occurring since the time of the original Complaint–including the Entry of September 24, 2004, the arbitration, and numerous agreements between United and either IAM or

---

[6]In support of this, Judge Tinder cited Tice v. Am. Airlines, Inc., 288 F.3d 313, 316 (7th Cir. 2002).

[7]Collectively known as the System Board of Adjustment, this arrangement was provided for in the CBA to resolve employee grievances.

[8]The issue in arbitration was "whether United violated the CBA by applying the layoff provisions of Article X [of the CBA] instead of the provisions contained in Letter of Agreement 74-1M" or more generally, "Did the Company violate the collective bargaining agreement by the manner in which it implemented the 2003 layoff?"  Def.'s Br. in Supp. at 4.  The details behind this question may be found in the previous entry of this Court.  Both the comprehensiveness of the arbitration decision and the lack of any mention of these issues in any of Plaintiffs' briefs satisfies us that these issues have now been dealt with conclusively.

[9]This letter is discussed at length in the entry of September 24, 2004.  It is not relevant here, so no discussion of its details is necessary.

AMFA–this Court granted leave to Plaintiffs to file an amended Complaint. That amended Complaint alleged three wrongs: IAMAW's failure to file a grievance pursuant to a letter of understanding between IAM and United, Letter 94-5M; breach of IAM's duty of fair representation;[10] and most important (because it was not resolved by arbitration or agreement), a violation by United of the WARN Act. Although United and IAM took up Plaintiffs' allegations against IAM (the nonuse of Letter 94-5M and the breach of the duty of fair representation), none of Plaintiffs briefs or motions included any arguments regarding these claims. The Letter 94-5M issue is now resolved as to all Plaintiffs other than Afewerki Abebe, pursuant to a Joint Stipulation of Dismissal [Docket No. 164] entered on February 15, 2008. With regard to the remaining Letter 94-5M claim maintained by Afewerki Abebe, as well as any residual duty of fair representation claims by Plaintiffs, it is clear that IAM is entitled to summary judgment, and United is entitled to summary judgment in part, because these issues were addressed as part of the arbitration and because Plaintiffs do not further dispute the resolution of these issues.[11]

---

[10]This issue was discussed, and in fact made up the large part of the earlier Entry of September 24, 2003. It too is unimportant at the present stage of the litigation.

[11]"Whether a collective bargaining agreement contains such terms is a question of interpretation to be decided by arbitrators when arbitration is the designated method of resolving issues arising under the agreement." Tice v. Am. Airlines, Inc., 288 F.3d 313, 316 (7th Cir. 2002). Because the arbitrator ruled that United's layoffs were proper, any claim by Plaintiffs that they were harmed by those layoffs is foreclosed. They are merely attempting to revisit issues already discussed by this Court and disposed of by the arbitrator. Seventh Circuit precedent is clear that, to set aside an arbitral award on the grounds that the union breached its duty of fair representation, a plaintiff must show that the breach affected the outcome of the arbitration. Williams v. Romano Bros. Beverage Co., 939 F.2d 505, 508 (7th Cir. 1991).

(continued...)

In summary, therefore, Plaintiffs' WARN Act claim against United is the sole dispute remaining in this litigation.  In its Motion for Summary Judgment, United argues that the onset of the Iraq War and its attendant economic effects constituted an exception to the WARN Act that relieves the Company of liability to Plaintiffs.  Plaintiffs argue that other factors, either in combination with or instead of the Iraq War, were responsible for the layoffs and that no exception to the WARN Act is available on the facts here.

### *Legal Analysis*

### I.    *Standard of Review*

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party

---

[11](...continued)
Plaintiffs cannot show this harm because the layoffs were proper.  Therefore, this claim must be dismissed.  We are further led to this conclusion by the fact that Plaintiffs failed to make any arguments regarding either Letter 94-5M or the duty of fair representation and by the Joint Stipulation of Dismissal of February 15, 2008.  IAM filed notice informing Abebe of his obligation to contest these arguments by June 24, 2008, but he has failed to respond to that filing or to the directives of this Court regarding these issues.  Thus, we GRANT summary judgment against Abebe on both claims and against all other Plaintiffs on the duty of fair representation claim only (because the Letter 94-5M claim has already been dismissed against them).

and draws all reasonable inferences in favor of the non-moving party.  See id. at 255.

However, neither the "mere existence of some alleged factual dispute between the

parties," id. at 247, nor the existence of "some metaphysical doubt as to the material

facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will

defeat a motion for summary judgment.  Michas v. Health Cost Controls of Illinois, Inc.,

209 F.3d 687, 692 (7th Cir. 2000).

 The moving party "bears the initial responsibility of informing the district court

of the basis for its motion, and identifying those portions of [the record] which it believes

demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears

the burden of proof at trial may discharge its burden by showing an absence of evidence

to support the non-moving party's case.  Id. at 325.

 Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle

for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th

Cir. 1994).  Thus, after drawing all reasonable inferences from the facts in favor of the

non-movant, if genuine doubts remain and a reasonable fact-finder could find for the

party opposing the motion, summary judgment is inappropriate.  See Shields Enter., Inc.

v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg,

870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to

satisfy the legal requirements necessary to establish her case, summary judgment is not

only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP,

324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

Courts are often confronted with cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief.  "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard." Kohl v. Ass'n. of Trial Lawyers of Am., 183 F.R.D. 475 (D.Md.1998). Thus, in determining whether genuine and material factual disputes exist in this case, the Court has considered the parties' respective memoranda and the exhibits attached thereto, and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective non-movant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

## II.  WARN Act Claim

Congress passed the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2101-2109 ("WARN Act" or "Act"), to "soften the economic blow suffered by workers who unexpectedly face plant closing or mass layoffs." Rocquet v. Arthur Andersen LLP, 398 F.3d 585, 586 (7th Cir. 2005).  The Act "requires employers . . . to give [their] employees 60 days' advance notice of a plant closing [or layoff]." Pena v. American Meat Packing Corp., 362 F.3d 418, 421 (7th Cir. 2004) (citing 29 U.S.C.

§2102(a)).  This requirement, and therefore the employer's liability, may be "eliminated or reduced" if the closing or layoff resulted from "business circumstances that were not reasonably foreseeable as of the time that notice would have been required."  Rocquet, 398 F.3d at 586; 29 U.S.C. §2102(b)(2)(A).  The employer asserting the unforeseen business circumstance exception carries the burden "to show that a 'sudden, dramatic, and unexpected' event occurred which precipitated" the mass layoff.  20 C.F.R. §639; see also Jurcev v. Central Community Hosp., 7 F.3d 618, 625 (7th Cir. 1993).  Examples of such an occurrence include "[a] principal client's sudden and unexpected termination of a major contract with the employer, a strike at a major supplier of the employer, and an unanticipated and dramatic major economic downturn . . . ." Id. at §639.9(b)(1).  A court assessing the applicability of the unforeseen business circumstance exception must determine first whether the circumstance *caused* the layoffs and second whether the circumstance was *unforeseeable*.  See Jurcev, 7 F.3d at 623-25; Rocquet, 398 F.3d at 588 (noting that the exception has two elements, causation and foreseeability).

*A. Causation*

United argues that the "decisive issue in this case is whether [the Company] could and should have issued WARN notice . . . not whether in retrospect the war had any particular effect once it started . . . ."  Def.'s Reply at 3.  This contention, however, does

not reflect a correct reading of the law.[12]  Not only do <u>Jurcev</u> and <u>Rocquet</u>, two controlling precedents, hold otherwise, but it is clearly necessary to determine *a priori* whether the causal relationship between the unforeseen business circumstance and the layoffs exists.  Confining the analysis to foreseeability alone gives the exception little substance.[13] Therefore, before turning to the question of whether the Iraq War was foreseeable, we address the question of whether the escalation of the War, or some thing or combination of things, caused United to lay off its employees at the IMC.  The briefs submitted by both parties present convincing, yet divergent, accounts of causation.

According to United, just before the War, the Company was "on the [financial] precipice," (Def.'s Br. in Supp. at 6), and, "[a]s a result of the start of the War, United initiated War-related emergency employee reductions . . . , which were an immediate response to the instantaneous and precipitous drop in business due to War-related factors."  Def.'s Br. in Supp. at 2.  In the Company's view, the "onset of the Iraq War weakened [United's] finances to the point where, without immediate corrective action,

---

[12]The <u>Rocquet</u> court emphasized that the "heart of the dispute" in its WARN Act claim was "foreseeability." <u>Rocquet</u> 398 F.3d at 589.  But this simply meant that foreseeability was the more contestable issue–causation remained equally necessary to the determination.  <u>See Jurcev v. Central Community Hosp.</u>, 7 F.3d 618, 623-25 (7th Cir. 1993).

[13]United could say, for example, that it was unforeseeable in late February or early March that Syracuse University would win the 2003 NCAA Men's Basketball Tournament, an event temporally related to the layoffs underlying this case, and most courts would have to accept that unforeseeability argument under the legal standard.  But such an occurrence would have no facially demonstrable causal relationship with United's Spring 2003 layoffs at the IMC, and would therefore provide no exception to WARN's notice requirement.  Without showing causation, in other words, the analysis is meaningless.

United would be in default" of numerous credit agreements associated with its bankruptcy status.  Id. at 33.

United's causation argument depends on these figures:  "Domestic bookings for the week following the outbreak of shooting on March 19, 2003 were down approximately 15% from the previous year, while international bookings were down over 40%." Dingboom Decl. at ¶7. "From March to April 2003, United's domestic and international bookings . . . fell by 9.4% and 26% respectively." Def.'s Reply at 4. Furthermore, "United's gross passenger revenue was down nearly 17% from March to April 2003 . . . [and] April 2003 revenue was 21.2% lower than year-earlier." Id. United's argument is therefore rather straightforward: the Company's business outlook took a sharp, unprecedented downturn at the stroke of "10:15 p.m. EST on March 19, 2003," when President Bush announced the beginning of the Iraq War, and that financial toll led to United's decision to lay off the IMC mechanics.[14]  Without the War, United contends, the layoffs would not have been necessary.  See Dingboom Decl. at ¶6.

Not surprisingly, Plaintiffs' account of the cause of their job losses follows a different tack.  According to them, various foreseeable business circumstances predating the commencement of the War contributed to a financial slump that left United with little choice other than to pursue further cost-cutting strategies, including the layoffs of the IMC employees.  These other factors included:

---

[14]United's briefs repeatedly assure the Court that the losses causing the layoffs "began immediately after" the announcement of the beginning of the War.

> (1) United's precarious financial condition due to low cost competition, the lingering effects of 9/11, and the soft economy, all of which had been known several months, if not longer, prior to layoff; (2) the buildup to a shooting war in Iraq for several weeks, if not months prior to the layoff; and (3) the SARS outbreak . . . .

Pl.'s Cross-Motion for Summ. Judgment at 4.[15]  United contends that, even if all of these factors contributed to its economic failure, the Iraq War was nonetheless responsible for shoving United over the precipice.

Perhaps more important than other possible causes, Plaintiffs also point to statistics that they say undermine United's basic causation argument about the War.  Plaintiffs assert that "United's domestic bookings began dropping below year-ago levels in late February and were 40% below year-ago levels as of March 12, 2003."  Pl.'s Response at 7-8.  Plaintiffs' argument is that United's business was suffering to the same extent before the onset of the Iraq War on March 19, 2003, and that it was United's continued struggles to meet its creditors' demands, not the War, that led to the layoffs.  Consequently, since

---

[15]Plaintiffs maintain that United has conceded these facts, having adopted them previously in its Bankruptcy proceedings.  United counters that the basis of Plaintiffs' argument is inappropriate, given that the Court discouraged Plaintiffs' use of United's bankruptcy admissions against United.  The Court did state in a previous entry that United was not being inconsistent in its statements about how well it was coping with cost reductions and fulfillment of its bankruptcy obligations.  Entry of December 28, 2007 [Docket No. 161].  We did not, however, assert that it was entirely improper for Plaintiffs to point out that United has admitted in the bankruptcy context that numerous factors negatively impacted its business.  We merely acknowledged that United was, in fact, dealing with cost reductions, and that this was consistent with the notion that further cost reductions could be necessary because of an event like the Iraq War.  We do not side with either party on this matter because neither side has made a conclusive showing, with or without the bankruptcy evidence, as to whether it was the War alone that led to the layoffs or whether the War was bound up with various other factors ultimately leading to the layoffs.

United knew its business was declining before the War broke out, the Company should have known that job cuts would be necessary, and that should have prompted it to provide WARN Act notice.  Plaintiffs maintain that United is using the Iraq War as an excuse for its decisions: "The commencement of the war allowed United to . . . characterize the situation as one where there was no work because of 'other circumstances over which the Company has no control.'" Pl.'s Response at 33.[16]  United responds, asserting that the War in fact "caused discrete losses" and had an "immediate and palpable effect on United's revenue and operations" that created the need for further cost savings.  Def.'s Reply at 3.  As these divergent accounts show, the crux of the dispute between United and Plaintiffs is the causation element of the unforeseen business circumstance exception.

The Seventh Circuit has emphasized that application of the unforeseen business circumstance exception involves a case-by-case examination of the facts,  Pena v. Am. Meat. Packing Corp., 362 F.3d 418, 421 (7th Cir. 2004), and we have not been able to identify any controlling precedent providing a useful factual analogy to the case at bar.  A recent Tenth Circuit case, however, does inform our analysis of causation here.  See Allen

---

[16]Plaintiffs support this contention by quoting from an article that United attached to its Motion for Summary Judgment. The article, from the *New York Times*, quotes one travel industry insider's conjecture that major airlines were "using the war as a cover for reductions they should have made anyway, in response to slower air traffic since spring 2000." Pl.'s Response at 34.  We do not accept nor reject Plaintiffs' "excuse" argument, especially because the evidence on which it is based, although proffered by United, is of questionable admissibility at this point.  This is a fact in dispute, neither proved nor disproved, that requires further illumination, which can only be provided by a trial.

15

v. Sybase, Inc., 468 F.3d 642 (10th Cir. 2006).[17]  Like United, the defendants in Allen had

suffered economic hardship well before the decision was made to cut jobs, with operating

costs exceeding revenues over a multi-year period.  Id. at 646.  And, in Allen, the

defendants argued that the World Trade Center bombing of September 11, 2001, was an

unforeseeable business circumstance that caused their decision to engage in mass layoffs.

Id. at 647.  The Allen Court found that those defendants had made no more than a meager

showing regarding the impact of the 9/11 bombings, concluding that the defendants thus

had not presented a triable issue of fact: "Of Course, the 9/11 bombings were an

unexpected and unforeseen event.  However . . . defendants failed to produce . . . any

evidence that the 9/11 bombings did in fact cause the layoffs." Id. at 667.  The Allen court

emphasized that the defendants had "not even begun to meet their burden on this point."

Id.

        In the case at bar, while United has certainly "begun" to address its burden under

the exception, its efforts simply do not suffice to satisfy that burden.  Nor have Plaintiffs

succeeded in proving causation, as they set out to do in their Cross-Motion.  Because it

remains unclear from the submissions of the parties which theory more accurately

explains the facts, the evidence adduced thus far requires further development and

clarification.

        From our review of the statistics, we can say that the following general trends

---

        [17]The Allen case presents numerous factual and legal differences from our case, but it is
illustrative on the general applicability of the unforeseen business circumstance exception.

emerge: Flight bookings for United were falling steadily over the course of a few years preceding United's March 2003 decision to cut labor costs.  A comparison of bookings year-over-year[18] shows that, in almost any month, bookings were down from 2001 to 2002 and from 2002 to 2003.  Only during the period of December 2002 through January 2003 did bookings buck that trend, but they fell again sometime in February 2003. See Def.'s Response to Pl.'s Second Interr. [Docket No. 172] at 15. Overall, a steady decline in bookings over a number of years has been clearly shown, and a similar trend was apparent in monthly flight departures.  Id. at 19.

The dispute in this case, and the essence of the causation question, is whether the losses incurred in March 2003 were continuing losses or new losses. Unfortunately, because of varying interpretations of the data and the lack of any correlation between these statistics and other related circumstances, the evidence adduced does not substantiate conclusively either party's theory of causation.  Without data to show conclusively the trends during months or on specific dates, we are unable to ascertain when losses actually occurred and, if so, what caused them.[19]  Only an ultimate factfinder will be sufficiently prepared and authorized to resolve issues of accuracy and credibility of this data, which is essential to determining the causation element of the unforeseen

---

[18]That is, for example, January 2001 vs. January 2002 or April 2002 vs. April 2003.

[19]Again citing United's bankruptcy arguments set out in its 1113(c) motion, Plaintiffs point to statistics that show deceases in bookings as of March 12, 2003, a week before the announcement of the War, but this too is inconclusive because it remains unclear what caused the drop or what relation the drop has to any other factor, including the War.

business circumstance exception. As the record stands, it is impossible to determine whether the Iraq War was the one-ton straw that broke United's back, thereby leading to the mass layoffs at the IMC, or whether it was an incremental straw–simply one of many factors contributing to a larger business failure, leading to the layoffs in question. This determination may be likened to discerning whether the wind caused the light post to fall or if, more accurately, it was due to the eroding presence of rust at its base.

United has pointed only to the "precipitous decreases" in bookings and departures that it alleges coincided with the beginning of the War, but this showing is disputed and inconclusive. Similarly, Plaintiffs have failed to disprove United's causation argument or to produce conclusive factual connections between other pre-war factors and the layoffs. The situation was summed up best by United Vice President Peter Kain. He was asked in his deposition, "Do you know if the airline attributed the decline in passenger travel to either or both the Iraqi invasion or the SARS outbreak?" His answer: "My recollection is that we thought both of those had some impact." Dep. Of Peter Kain at 35-37. The same, it seems, can be said for all of the other factors proposed by the parties.[20] It remains indiscernible from the data what motivated the layoffs. A trial is necessary therefore to sort out the credibility of the data introduced and ultimately to draw accurate conclusions about the facts in this case. The causation issue, which rests here entirely on disputed

---

[20]The summary judgment presentations of both parties recall Sherlock Holmes's famous methodology: "Eliminate all other factors, and the one which remains must be the truth." Sir Arthur Conan Doyle, The Sign of Four (1890). In the case at bar, neither United nor Plaintiffs have eliminated any factors nor satisfactorily established one dominant factor, so the truth remains undeterminable.

facts, is one of utmost materiality, and because it remains a source of genuine doubt, it must be resolved by a factfinder.

1. Judicial Notice of the Effect of the SARS Outbreak

Nesting within the causation determination is a narrower concern: may this Court take judicial notice of the effect of Severe Acute Respiratory Syndrome ("SARS") on booking rates in the airline industry?  Plaintiffs argue that SARS and other factors contributed as much or more to the business failure leading to the IMC layoffs than did the Iraq War.  To prove the role SARS played in United's economic predicament, Plaintiffs offer newspaper articles explaining the negative impact the disease had on international air travel.  We must decide whether to take judicial notice of these articles and the facts they purport to show.

Rule 201 of the Federal Rules of Evidence allows a court to take judicial notice of a fact – conclusive establishment of which dispenses with the need for any formal proof in a civil case – if one party requests.  Fed. R. Ev. 201; see also General Elec. Capital Corp. v. Lease Resoution Corp., 128 F.3d 1074, 1081 (7th Cir. 1997).  A court may take judicial notice of a fact generally known within the court's jurisdiction.  United States v. Evans, 994 F.2d 317, 322 n.1 (7th Cir. 1993), cert. denied. 510 U.S. 927 (1993) (taking judicial notice that crime was prevalent in a particular area of Milwaukee).  Or a court may take judicial notice of facts capable of ready and accurate determination.  The Pantry, Inc. v. Stop-N-Go Foods, Inc., 777 F. Supp. 713, 733 (S.D. Ind. 1991), modified,

796 F. Supp. 1164 (1992) (taking notice of the fact that benzene is a known carcinogen because a report by the Environmental Protection Agency made that fact not reasonably disputable). In addition, a court may take judicial notice of matters in the public record. Palay v. United States, 349 F.3d 418, 425 (7th Cir. 2003). Moreover, a court may take judicial notice of publicity itself.   Chochran v. NYP Holdings, 210 F.3d 1036, 1038 (9th Cir. 2000).

No Seventh Circuit decision, however, clarifies whether a newspaper article is a matter of public record, nor does any case approve the taking of judicial notice of facts set out in a newspaper article. How these principles are to be applied in the trial court is far from clear. At least one case from within the Circuit does seem to approve of this form of judicial notice. See Schmude v. Sheahan, 312 F.Supp.2d 1047 (N.D. Ill. 2004) (holding that the Court's taking of judicial notice of a newspaper article is not an "investigation" and therefore is no reason to question a court's impartiality); see also In re Copper Market, 2003 WL 22495750 (W.D. Wis., August 20, 2003). Schmude relied on an interpretation that the Seventh Circuit, in Mirfasihi v. Fleet Mortgage Corp., 356 F.3d 781 (7th Cir. 2004), had approved of judicial notice of newspaper articles. Unfortunately, however, it appears that judicial notice played no role in the Mirfasihi decision, making this unreliable precedent for that point of law. Moreover, at least one court within the Circuit has refused to take judicial notice of a newspaper article. See Alliance to End Repression v. City of Chicago, 2000 WL 1898594 (N.D. Ill., Dec. 22, 2000) (declining to take judicial notice of the racial composition of the Chicago Housing Authority police on the

basis of a statement in a newspaper article).  The issue of whether judicial notice based on

newspaper articles is permissible simply has not been resolved in the Seventh Circuit.

Guidance is available, however, in a recent opinion from another circuit.  In U.S.

v. Friday, 525 F.3d 938 (10th Cir. 2008), the Tenth Circuit refused to take judicial notice

of a newspaper article that stated that golden eagles had recently been killed by power

lines in Wyoming, concluding that these facts did not satisfy either of the Rule 201

standards.[21]  Thus, we are of the view that when the "fact" depends on the establishment

of a causal connection, a determination of whether one thing–power lines or

SARS–caused another thing–eagle deaths or booking drops, it is not the sort of

indisputable fact subject to judicial notice.  See Friday, 525 F.3d at 958-59.  If Plaintiffs

want to demonstrate the effects SARS had on the airline industry, they will have to prove

those effects formally.  The judicial notice analysis therefore fits into and does not alter

our general conclusion regarding causation.  Both parties will be required to make more

definitive showings of whether the Iraq War, or some other thing or things, led to the

layoffs at the IMC.

*B. Foreseeability*

If United's continuous business troubles caused the layoffs, then those layoffs may

---

[21]While at least one circuit court has taken judicial notice of newspaper articles, see
Peters v. Delaware River Port Authority of Pennsylvania and New Jersey, 16 F.3d 1346 (3d Cir.
1994) (taking judicial notice of newspaper reports recounting political competition between
Pennsylvania and New Jersey), we regard the Friday case as being more directly on point.

have been foreseeable enough for WARN notice to be required.  If, however, the Iraq

War caused the layoffs, then foreseeability was less likely.  A business circumstance can

be reasonably unforeseeable if its cause was "sudden, dramatic, and unexpected . . . or

outside the employer's control."  Rocquet, 398 F.3d at 588 (citing 20 C.F.R.

§639.9(b)(1)).  This does not mean, it should be noted, that the employer must be "caught

completely off guard" because "it is the probability of occurrence that makes a business

circumstance reasonably foreseeable, rather than the mere possibility of such a

circumstance."  Id. at 589, 590 (internal citations omitted).

    In answering the foreseeability question, the Seventh Circuit in Rocquet looked

back 60 days from the date of the layoffs to determine whether at that time, the event

causing the layoffs would have been probable or merely possible.  Id. at 589.  If the event

causing the layoffs in this case was the announcement of the Iraq War, then we must

ascertain whether that event and its timing were probable 60 days before that

announcement.  This is, to put it mildly, a difficult determination, but the Seventh Circuit

has provided helpful guidance for undertaking such a retrospective analysis: subsumed

into the analysis is an inquiry into "whether a similarly situated employer exercising

reasonable judgment could have foreseen the circumstances that caused the layoff."  Id. at

588 (citing 20 C.F.R. §639(b)(2)).  Accordingly, if a dramatic circumstance causes a

serious loss for an employer, "a company will not be liable if . . . it reacts the same way

that other reasonable employers within its own market would react."  Id.[22]

Under this rubric, we cannot in hindsight fairly require United to have predicted the onset of the Iraq War, in particular its timing.  Plaintiffs make much of United's contingency planning for the War, saying that if the Company knew enough to discuss the probable effects the War would have, then the War itself was foreseeable.  But insuring against something and feeling somewhat certain of its likelihood are two different things. Even if the War was not entirely unexpected to United, the Company could not have known with any reasonable certainty when it would begin and certainly not with sufficient certainty to give layoff notice to Plaintiffs.  "WARN notice was not intended to force financially fragile, yet economically viable, employers to provide WARN notice . . . when there is a *possibility* that the business may fail at some undetermined time in the future."  Rocquet, 398 F.3d at 589 (quoting Watson v. Mich. Indus. Holdings, Inc., 311 F.3d 760, 765 (6th Cir. 2002)).

Plaintiffs contend that United should have taken more time to assess the actual impact the War would have on its business, but we think it was reasonable for United to decide to put the layoffs into effect immediately.  United reacted reasonably in light of the airline industry's experiences in the previous Gulf War.  In our view, assuming the War caused the layoffs, it was commercially reasonable for United to make a quick and

---

[22]United repeatedly points to the identical response on the part of the rest of the airline industry.  While this is, of course, relevant and informative to our determination here, it is not clear at this point whether the action was a commercially reasonable response to the escalation of the War or rather an excuse, as Plaintiffs allege, provided by all airlines at roughly the same time.

informed business judgment that fewer mechanics would be needed as part of its workforce.

This conclusion, because it confronts both the probability of the conflict and the reasonableness of United's preparation for the conflict, addresses both questions of the foreseeability analysis. Because it is still unclear, however, whether the Iraq War was in fact the direct cause of the job losses at issue, both elements for the unforeseen business circumstance exception have not been proved. Therefore, the foregoing foreseeability analysis does not alter our position that the central WARN issues in this case are not suitable for resolution on summary judgment.

### III. *Plaintiffs' Partial Summary Judgment Claim*

Plaintiffs also argue that they are entitled to partial summary judgment, asserting that if United is excused from the 60-day requirement, it still should have been responsible for some notice, since the notice requirement was merely "reduced" but not eliminated. See 29 U.S.C. §2102. Plaintiffs argue that they are due "wages or back pay for the period of time from when they were sent home . . . through the effective date of the layoff on April 20, 2003." Pl.'s Br. in Supp; 29 U.S.C. §2104(a)(1)(A). According to Plaintiffs, that reduction should focus on the day that Plaintiffs were placed on

Authorized No Pay status, since at that time, United knew of the effects of the Iraq War.[23]

The analysis of this partial summary judgment claim folds into the broader WARN Act analysis because United still has the protection of commercial reasonableness.  As the Seventh Circuit said, "[A] company *will not be liable* if, when confronted with potentially devastating circumstances, it reacts the same way that other reasonable employers would act."  Rocquet, 398 F.3d at 588 (emphasis added).  Plaintiffs emphasize §2102, which focuses on "reduction" rather than elimination, but the statute is not entirely clear about the scope of the unforeseen business circumstances exception, that is, whether it covers both reduction and elimination or only elimination of notice.  Rocquet is quite clear, however, that the limitation applies equally to elimination and reduction of WARN Act notice.  See id.  Paralleling the discussion of the general applicability of the unforeseen business circumstance exception, the disposition of this partial summary judgment reduction theory depends on whether the Iraq War was an unforeseen business circumstance that caused United to react by laying off the mechanics at the IMC.  As discussed above, this remains unresolved.[24]  Therefore, Plaintiffs are not entitled to partial

---

[23]Plaintiffs underscore §2106 of the WARN Act, which "encourages" (although it does not require) an employer who is exempted from the notice requirement to nonetheless provide notice "to the extent possible."  29 U.S.C. §2106.

[24]Plaintiffs' claim also falters because it incorrectly categorizes United's decision to set Plaintiffs' status as Authorized No Pay (the time at which Plaintiffs' were "sent home") as effectively serving as United's WARN notice.  United never intended this action to serve as "notice" under the WARN Act.  At the time United placed Plaintiffs on Authorized No Pay status, the Company was not certain that it would fire Plaintiffs, so it would not have been logical for United to notify Plaintiffs that they were going to be laid off.  Because Authorized No

(continued...)

summary judgment in their favor.

## IV.  Conclusion

Having considered each party's case with regard to WARN Act analysis, we conclude that neither United nor Plaintiffs have established that there is no genuine issue of material fact requiring a trial.  With regard to issues surrounding Plaintiffs' Letter 94-5M and Duty of Fair Representation claims, we conclude that these are now resolved and no genuine issue of material fact exists.  Therefore, IAM's Motion for Summary Judgment is <u>GRANTED</u>; United's Motion for Summary Judgment is <u>GRANTED IN PART</u> and <u>DENIED IN PART</u>; and Plaintiffs' Cross-Motion for Summary Judgment is <u>DENIED</u>.

IT IS SO ORDERED.


Date: ___09/15/2008_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana


Copies to:

Richard Emerson Aikman Jr.
STEWART & IRWIN P.C.
raikman@silegal.com

---

[24](...continued)
Pay status is not a layoff nor a notice of a layoff, Plaintiffs' argument is unavailing.

Edward Gerard Bielski
STEWART & IRWIN P.C.
ebielski@silegal.com

Robert A. Bush
BUSH QUINONEZ GOTTLIEB SINGER LOPEZ KOHANSKI & DICKINSON
rbush@geffner-bush.com

Joshua L. Ditelberg
SEYFARTH SHAW LLP
131 S. Dearborn Street
Suite 2400
Chicago, IL 60603

Kathleen M. Erskine
BUSH QUINONEZ GOTTLIEB SINGER LOPEZ KOHANSKI & DICKINSON
kerskine@geffner-bush.com

Ira L. Gottlieb
BUSH QUINONEZ GOTTLIEB SINGER LOPEZ KOHANSKI & DICKINSON
igottlieb@geffner-bush.com

William R. Groth
FILLENWARTH DENNERLINE GROTH & TOWE
wgroth@fdgtlaborlaw.com

Michael K. Irwin
STEWART & IRWIN
mirwin@silegal.com

Gary S. Kaplan
SEYFARTH SHAW LLP
gkaplan@seyfarth.com

Mickey J. Lee
STEWART & IRWIN P.C.
mlee@silegal.com

Michael  Rabinowitch
WOODEN & MCLAUGHLIN LLP
mrabinowitch@woodmclaw.com

27

Carla Markim Siegel
IAMAW Legal Department
csiegel@iamaw.org

Tara L. Sohlman
STEWART & IRWIN P.C.
tsohlman@stewart-irwin.com

Donald H. Wray
STEWART & IRWIN P.C.
dwray@silegal.com

AFEWERKI ABEBE
1668 Purcell Circle
Indianapolis, IN 46231